UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PLEXXIKON INC.,<br><br>                Plaintiff,<br><br>   vs.<br><br>NOVARTIS PHARMACEUTICALS CORPORATION,<br><br>                Defendant. | Case No. 4:17-cv-04405-HSG<br><br>**ORDER REGARDING MOTIONS TO EXCLUDE DAMAGES EXPERTS' OPINIONS**<br><br>Re: Dkt. Nos. 169, 202 |

Pending before the Court are the parties' motions to exclude certain expert opinions and testimony related to damages. Plaintiff Plexxikon Inc. ("Plexxikon") moves to exclude opinions and testimony of defendant's damages expert, James E. Malackowski. Dkt. No. 169 ("Pl. Mot."). Defendant Novartis Pharmaceuticals Corporation's ("Novartis") moves to exclude the testimony of plaintiff's damages expert, Gregory J. Leonard. Dkt. No. 202 ("Def. Mot."). The Court heard oral argument on these motions on November 1, 2019. *See* Dkt. No. 341. As detailed below, the Court **DENIES** Novartis' motion and **GRANTS IN PART** and **DENIES IN PART** Plexxikon's motion.

**I.      BACKGROUND**

This is a patent infringement case related to Plexxikon's patents for kinase inhibitors. Plexxikon accuses Novartis' melanoma drug Tafinlar, which Novartis acquired for $2 billion from GlaxoSmithKline in 2015. Tafinlar works by inhibiting B-Raf, a type of kinase. The parties agree that the asserted patents have never been licensed. Nevertheless, both parties' damages experts rely on purportedly comparable licenses under a "hypothetical negotiation" framework in order to determine a reasonable royalty for the asserted patents.

Plexxikon's expert, Dr. Leonard, opines that at the time of the hypothetical negotiation,

both parties would have had "walk away points" beyond which they would not have entered a license. *See* Dkt. No. 403-6 ("Leonard Report") ¶ 45. For Plexxikon, the walk-away point relates to the drug Zelboraf, which is sold by its licensee, Roche.[1] Zelboraf is not covered by the asserted patents. *See id.* ¶ 78. However, Zelboraf competes directly with Tafinlar as the only other B-Raf inhibitor on the market. *Id.* ¶ 61. Dr. Leonard opines that Plexxikon would have considered the "opportunity cost" of licensing to Novartis in terms of lost royalties from Zelboraf sales. *Id.* ¶ 60. Assuming that Zelboraf would capture the projected Tafinlar sales in the absence of a Novartis license, Dr. Leonard concludes that Plexxikon would not have accepted less than a 5.5% royalty rate. *Id.* ¶ 71.

Separately, Dr. Leonard opines that the Roche collaboration agreement that covers Zelboraf is also the most comparable license. *Id.* ¶ 83. Although they involve different patents, Plexxikon's technical expert opines that the technology is comparable, and Dr. Leonard finds that the markets are similar because Zelboraf and Tafinlar serve the same patients through the same mechanism of action and Roche and Novartis are similarly situated. *Id.* ¶ 103. Since the Roche agreement also involves other types of collaboration ("know-how," identification of a single lead compound, etc.), Dr. Leonard apportions the value of the intellectual property by comparing royalties in countries that did and did not have patent protection. *Id.* ¶¶ 107-09. Dr. Leonard thus concludes that without these additional factors, the effectively royalty rate for the patents would be 6.26%-12.52%. *Id.* ¶ 144.

Novartis' expert, Mr. Malackowski, disagrees that the Roche collaboration agreement is comparable because, among other reasons, it identifies a specific compound and provides broad collaboration benefits. Dkt. No. 393-17 ("Malackowski Report") at 102-07. By contrast, in a hypothetical negotiation, Plexxikon would have provided only a bare license, leaving the difficult work of identifying and developing a specific compound to Novartis. *Id.* at 107; *see also* Leonard Report ¶ 128 (agreeing that only bare license would be provided). During deposition, Mr.

---

[1] Specifically, Hoffman-La Roche Inc. and F. Hoffman-La Roche Ltd. (together, "Roche"). Dr. Leonard also refers to Genentech as making the actual sales. *See* Leonard Report ¶ 59.

Malackowski testified that narrow patents that identify a specific compound are more valuable than broad genus patents because the latter are "like a state permit to dig for gold in California," while the former provide "a treasure map with an X on the spot." Dkt. No. 397-5 ("Malackowski Depo.") at 37:20-38:3, 146:22-147:1. Instead of the Roche license, Mr. Malackowski opines that three other license agreements between Novartis and Rigel Pharmaceuticals, Inc., Curis, Inc., and Harvard Corporation (the "Rigel," "Curis," and "Harvard" licenses, respectively) are comparable. Malackowski Report at 50, 65.

All three agreements are "freedom to operate" licenses. *Id*. at 41, 54, 62. The Rigel license arose from a legal settlement based on Novartis' desire to avoid litigation. *Id*. at 40-41. It licensed patents related to a different kinase inhibitor for a drug used to treat a different cancer type. *Id*. at 46-49. The Curtis license also arose from a settlement of a lawsuit in which Novartis further argued that the patents were invalid. *Id*. at 50. Again, Novartis testified that it agreed to the license because doing so was cheaper than litigation. *Id*. at 53-54. The licensed drug treated skin cancer, not melanoma. *Id*. at 58. Last, the Harvard license arose when Harvard approached Novartis about licensing one of its products. *Id*. at 64. Novartis' 30(b)(6) witness testified that "Novartis determined that it would be cheaper to take the license than risk litigation for freedom to operate purposes." Dkt. No. 397-6 ("Waibel Depo.") at 207:25-208:3. The licensed drug targets multiple myeloma, not cancer, using a different type of inhibitor. Malackowski Report at 68.

Mr. Malackowski opines that these licenses are comparable because the parties, the license terms, the patents, and the licensed product are all comparable. Namely, Rigel and Curtis are both biotechnology companies that focus on drug discovery and collaboration, similar to Plexxikon; the agreements provided a bare, non-exclusive license; the patents claim a broad genus of molecules without identifying a specific compound; the licensed products have similar value and were on the market for comparable amounts of time; and the parties were in a similar financial state at the time of the license. *Id*. at 42-50, 54-62, 64-71. Based considerably on these licenses, Mr. Malackowski concludes that a reasonable royalty would be a lump sum of $3.5 million. *Id*. at 96. However, he also provides an alternative reasonable royalty opinion based on a greater discounting of the Roche license royalty rate. *Id*. at 130.

3

## II. LEGAL STANDARD

Federal Rule of Evidence 702 allows a qualified expert to testify "in the form of an opinion or otherwise" where:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Expert testimony is admissible under Rule 702 if it is both relevant and reliable. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). "[R]elevance means that the evidence will assist the trier of fact to understand or determine a fact in issue." *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007); *see also Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) ("The requirement that the opinion testimony assist the trier of fact goes primarily to relevance.") (quotation omitted). Under the reliability requirement, the expert testimony must "ha[ve] a reliable basis in the knowledge and experience of the relevant discipline."[2] *Primiano*, 598 F.3d at 565. To ensure reliability, the Court "assess[es] the [expert's] reasoning or methodology, using as appropriate such criteria as testability, publication in peer reviewed literature, and general acceptance." *Id.* at 564.

To satisfy these standards, testimony and evidence related to patent damages must be "tied to the facts of the case." *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1315 (Fed. Cir. 2011) (quoting *Daubert*, 509 U.S. at 591); *see id.* ("If the patentee fails to tie the theory to the facts of the case, the testimony must be excluded."). "Any evidence unrelated to the claimed invention does not support compensation for infringement but punishes beyond the reach of the statute." *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010). In addition, under Federal Rule of Evidence 403, a court may exclude evidence "if its probative value is substantially outweighed by a danger of . . . unfair prejudice." *See, e.g.*, *Prism Techs. LLC v. Sprint Spectrum L.P.*, 849 F.3d 1360, 1368 (Fed. Cir. 2017). That said, when evidence meets the "minimum

---

[2] Admission of expert testimony is evaluated under regional circuit law—here, the law of the Ninth Circuit. *See Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1391 (Fed. Cir. 2003).

4

threshold" of being based on case-specific data and sound methodology, disagreements as to comparability go to weight, not admissibility. *ActiveVideo Networks, Inc. v. Verizon Commn's, Inc.*, 694 F.3d 1312, 1334 (Fed. Cir. 2012); *accord Primano*, 598 F.3d at 565 ("Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." (quoting *Daubert*, 509 U.S. at 596)).

### III. DEFENDANT'S MOTION TO EXCLUDE EXPERT TESTMONY OF GREGORY K. LEONARD, PH.D

Novartis moves to exclude Dr. Leonard's opinions in their entirety on two grounds. First, Novartis argues that Dr. Leonard's analysis lacks reliability because he focuses on valuing the exclusionary value of the asserted patents and fails to apportion damages based on the "inventive contribution" of the patents. Second, Novartis argues that Dr. Leonard improperly conducts a lost profit analysis by setting a "minimum" royalty based on lost Zelboraf sales without satisfying the rigorous test for lost profit recovery.

#### A. Apportionment

A long-standing rule holds that "[t]he patentee . . . must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features, and such evidence must be reliable and tangible, and not conjectural or speculative." *Garretson v. Clark*, 111 U.S. 120, 121 (1884). That is because damages in a patent case are meant to capture "the value of what was taken," which is the patented invention. *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014). Thus, "where multi-component products are involved, the governing rule is that the ultimate combination of royalty base and royalty rate must reflect the value attributable to the infringing features of the product, and no more." *Id.*; *see also VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308 (Fed. Cir. 2014). An exception to this rule, called the "entire market value rule," permits a patentee to obtain damages based on the value of the accused products as a whole "where the patented feature creates the basis for consumer demand" or "substantially creates the value of the component parts." *Uniloc*, 632 F.3d at 1318.

Even where the patented features are not part of a multi-component product, damages must

5

still reflect "the incremental value that the patented invention adds to the end product." *Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prods. Grp., LLC*, 879 F.3d 1332, 1348 (Fed. Cir. 2018). For example, in *Exmark*, the patent covered a lawn mower as a whole, not any single component. *See id.* However, the court still held that damages had to be apportioned between the conventional and inventive aspects of the claim. *Id.* Similarly, in *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1338 (Fed. Cir. 2015), the court found that the patents covered an entire pharmacological compound, not any one component. However, because the active ingredient was covered by a different, expired patent—and was therefore conventional—damages needed to be apportioned to account for the "inventive" feature of the patent, which was the subcoating. *Id.* at 1337-38.

Apportionment can be addressed "in a variety of ways." *Exmark*, 879 F.3d at 1348. Aside from adjusting the royalty base or royalty rate, a proper analysis of the *Georgia-Pacific* factors may account for the value of the invention. *Id.* at 1348-49.[3] That is because the *Georgia-Pacific* factors already account for the "utility and advantages of the patent property over any old modes or devices," "the nature of the patented invention," and the "portion of the realizable profit that should be credited to the invention." *AstraZeneca*, 782 F.3d at 1338; *see also Univ. of Pittsburgh v. Varian Med. Sys., Inc.*, 561 F. Appx 934, 947-50 (Fed. Cir. 2014) (finding that distinguishing inventive features "is precisely what the *Georgia-Pacific* factors purport to do"). Apportionment analysis does not require subtraction of the conventional elements where the inventive element is

---

[3] The *Georgia-Pacific* factors include (1) the royalties received by the patent owner for the licensing of the patent-in suit, proving or tending to prove an established royalty, (2) the rates paid by the licensee for the use of other patents comparable to the patent-in-suit, (3) the nature and scope of the license, (4) the licensor's established policy and marketing program to maintain its patent monopoly by not licensing others or by granting licenses under conditions, (5) the commercial relationship between the licensor and licensee, (6) the effect of selling the licensed inventions on other products sold by the licensee, as well as the value of the invention to the licensor as a generator of sales of non-patented items, (7) the duration of the patent and the term of the license, (8) the established profitability, commercial success, and popularity of the patented product, (9) the utility and advantages of the invention over old modes or devices, (10) the nature and benefits of the patented invention, (11) the extent to which the infringer had made use of the invention, (12) the portion of the profit or of the selling price for comparable businesses to use the invention or analogous inventions, (13) the portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, (14) the opinion of qualified experts, and (15) the amount that a licensor and licensee would have agreed upon if both had been trying to reach a licensing agreement at the time the infringement began. *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).

"substantially responsible for the value of the product." *AstraZeneca*, 782 F.3d at 1339.

Here, Novartis argues that Dr. Leonard testified during deposition that his analysis values Plexxikon's right to exclude, not the incremental value of the patented inventions. *See* Dkt. No. 393-29 ("Leonard Depo.") at 90:22-25 (describing the purpose of his analysis as "get[ting] a royalty that reflects the value of the licensor's right to exclude"). Dr. Leonard apparently did not consider the inventive aspects of the patent claims and relied entirely on Plexxikon's technical expert, Dr. Michael Metzker, for this analysis. *See id*. at 42:23-44:1, 40:4-17. Novartis thus argues that Dr. Leonard fails to account for Novartis' own inventive contribution in identifying and developing the specific molecule embodied in Tafinlar, which has been separately patented.

Plexxikon responds, in the first instance, that the right to exclude is equivalent to the incremental value of the invention because low-value inventions would have many noninfringing alternatives.[4] That may be true for narrow "improvement" patents, but it would not be true for broad "blocking" patents. *Cf. Acorda Therapeutics, Inc. v. Roxane Labs., Inc.*, 903 F.3d 1310, 1337 (Fed. Cir. 2018) (a patent is "blocking" where "practice of a later invention would infringe the earlier patent"). For example, a patent for a car with novel tires can be avoided by making a car without those tires. But a patent for a car could not be avoided by a party that invents novel tires, no matter how innovative the invention. Here, Novartis argues that Plexxikon's patents cover trillions of compounds that require significant additional research and development to identify specific useful compounds. The right to exclude cannot account for these latter inventive contributions and thus cannot fully apportion value.[5] *Cf. Exmark*, 879 F.3d at 1350 (finding "problematic" that an expert ignored defendants' own patents for the accused products).

---

[4] Plexxikon also argues that Novartis' cited cases do not apply because they deal with multi-component products. That is incorrect: the principle stated in those cases has been applied to claims that cover the entire product. *See, e.g.*, *AstraZeneca*, 782 F.3d at 1338 (citing *Ericsson*, 773 F.3d at 1233). Plexxikon cites *AstraZeneca* in its brief and presumably knows as much.

[5] The current case presents an opposite scenario from the one in *AstraZeneca*. There, the active ingredient was known, but the invention provided an improvement in subcoating that made the commercial embodiment viable. 782 F.3d at 1339. Here, Plexxikon invented the ingredient, but Novartis apparently provided the improvements that allowed the drug to be brought to market. Since *AstraZeneca* affirmed attributing the value of the entire product to the improvement in the subcoating, it seems inconsistent to also attribute the entire value to the basic ingredient.

Plexxikon further argues that Dr. Leonard nevertheless apportioned damages because he relies on the Roche agreement that provides for royalties reflecting Roche's development costs and for lower royalties in countries that lack patent protection. While that may be sufficient to distinguish the value of the intellectual property compared to other benefits provided under the collaboration agreement (know-how, etc.), it cannot value the inventions of the asserted patents because the Roche patents cover different technology. Intellectual property is not fungible, and the value of one invention is not indicative of the value of another. *See ResQNet.com*, 594 F.3d at 869 (requiring "district courts performing reasonable royalty calculations to exercise vigilance when considering past licenses to technologies other than the patent in suit"); *LaserDynamics, Inc. v. Quanta Comp., Inc.*, 694 F.3d 51, 79 (Fed. Cir. 2012) ("alleging a loose or vague comparability between different technologies or licenses does not suffice").

Nevertheless, Plexxikon provides enough evidence to show that these deficiencies are best addressed through cross-examination, rather than exclusion. *See ActiveVideo*, 694 F.3d at 1334. Dr. Leonard opines, as relevant, that both the Roche patents and the asserted patents are "critical to the effectiveness of" their respective products, Zelboraf and Tafinlar. Leonard Report ¶ 103. Dr. Metzker supports this opinion in his technical report. *See* Dkt. No. 441-1 ("Metzker Report") ¶ 113. Dr. Leonard further opines that Zelboraf and Tafinlar operate in the same competitive space and serve the same patient populations. Leonard Report ¶ 103. The Federal Circuit recently affirmed a jury verdict based on similar evidence of damages, where the plaintiff's expert testified regarding a license for a related, earlier technology and "the components at issue, for purposes of apportionment to the value of a larger product or service, were comparable." *Elbit Sys. Land & C4I Ltd. v. Hughes Network Sys., LLC*, 927 F.3d 1292, 1300-01 (Fed. Cir. 2019); *see also Summit 6, LLC v. Samsung Elecs. Co., Ltd.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015) (permitting reasonable royalty value "based upon comparable features in the marketplace"). Because the license agreement "already built in apportionment," it was sufficient to analyze the asserted patents by adjusting the values of the comparable license for the related patents. *Elbit*, 927 F.3d at 1301. Here as well, Plexxikon provides enough evidence of the comparability of the asserted patents to the Roche technology to make Dr. Leonard's testimony reliable.

Accordingly, the Court **DENIES** Novartis' motion in this respect.

### B.     Lost Profits

Under 35 U.S.C. § 284, damages for patent infringement must be "adequate to compensate for the infringement" but "in no event less than the reasonable royalty for the use made of the invention by the infringer." To prove actual damages in the form of lost profits, the patentee must show but-for causation, which is governed by the rigorous test articulated in *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152 (6th Cir. 1978). *See Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1545 (Fed. Cir. 1005). Alternatively, a reasonable royalty provides a "floor" for damages under the flexible "hypothetical negotiation" framework of *Georgia Pacific*, 318 F. Supp. at 1120-21. *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009). Calculating a reasonable royalty "is not an exact science" and permits multiple reliable methods. *Summit 6*, 802 F.3d at 1296.

Novartis argues that Dr. Leonard improperly relied on an incomplete lost profits analysis by setting a "floor" for the license based on lost sales of Zelboraf. In particular, Novartis argues that Dr. Leonard did not consider the third element of the *Panduit* test, which concerns Roche's manufacturing ability to make Tafinlar sales in the absence of a Novartis license. However, the Federal Circuit has approved of consideration of a patent owner's lost profits in a hypothetical negotiation framework, even without considering the *Panduit* test. *See, e.g.*, *Asetek Danmark A/S v. CMI USA Inc.*, 852 F.3d 1352, 1362-63 (Fed. Cir. 2017) ("[A] patent owner participating in a hypothetical negotiation would consider the profits on sales it might lose as a result of granting a license."); *Rite-Hite*, 56 F.3d at 1554 (finding it reasonable that "an unwilling patentee would only license for one-half of its expected lost profits"). The issue here is not whether Roche would have actually made Tafinlar's sales, but whether Plexxikon would reasonably believe during a hypothetical negotiation that this would happen. *See SEB S.A. v. Montgomery Ward & Co., Inc.*, 594 F.3d 1360, 1380 (Fed. Cir. 2010). Here, Dr. Leonard properly considered Plexxikon's *ex ante* expectations for lost royalties as part of a hypothetical negotiation framework, and Novartis may attack this evidence on cross examination.

Accordingly, the Court **DENIES** this part of Novartis' motion.

## IV. PLAINTIFF'S MOTION TO EXCLUDE THE OPINIONS AND TESTIMONY OF JAMES E. MALACKOWSKI

Plexxikon moves to exclude the opinions of Mr. Malackowski regarding three litigation settlement licenses. Plexxikon does not move to exclude Mr. Malackowski's rebuttal of Dr. Leonard's opinions, including his alternative royalty calculation based on the Roche collaboration agreement. Instead, Plexxikon argues only that the settlement licenses are unreliable under Rules 403 and 408 because they concern different technologies and markets and also reflect Novartis' desire to avoid litigation. Plexxikon also argues that Mr. Malackowski should not be permitted to testify that broad genus patents are worth less than narrower patents.

### A. Settlement Licenses

The court has discretion to admit evidence regarding settlement licenses if they are sufficiently probative of the value of the asserted patents. *Prism*, 849 F.3d at 1368-69. As the Supreme Court recognized, litigation settlements typically reflect three components: (1) the predicted judgment, discounted by its probability, (2) the costs of further litigation, and (3) the cost of settlement. *Id*. at 1369 (citing *Evans v. Jeff D.*, 475 U.S. 717, 734 (1986)). In the patent law context, the first element can be further broken down into (a) the expected judgment for infringement, and (b) the expected judgment for invalidity. *See id*. at 1370. Of these, only the first and third elements are relevant for patent valuation, and only in relation to infringement. *See id.* at 1369.

Thus, the probative value of a settlement license depends on the weight of the other factors. *Id.* at 1370. Where a license was negotiated after a court established validity and infringement, the license is "very probative of reasonable royalty" because it "duplicate[s]" the hypothetical negotiation framework. *AstraZeneca*, 782 F.3d at 1337. On the other hand, where the license was negotiated early in the suit, when expected costs of litigation and uncertainty over the outcome are highest, the license is less probative. *See Prism*, 849 F.3d at 1369. Moreover, additional litigation factors, such as the risk of enhanced damages or sanctions, will further skew the license amount away from proper patent valuation. *Id.* at 1370; *LaserDynamics*, 694 F.3d at 78. In short, settlement licenses are treated much like other licenses, requiring the proponent of the license to establish sufficient comparability while accounting for any differences. *See Elbit*,

927 F.3d at 1299-1300; *Prism*, 849 F.3d at 1370.

Plexxikon argues that settlement licenses must be excluded unless they are "the most reliable" on the record. That is simply not the law. *LaserDynamics*, which Plexxikon cites for this proposition, merely states that settlement licenses have been excluded until recently. *See* 694 F.3d at 77. It then distinguishes *ResQNet*, which earlier permitted such licenses based, in part, on the settlement license in that case being "the most reliable" on record.[6] 594 F.3d 872. Nothing in *LaserDynamics* or *ResQNet* suggests that a settlement license *must* be the most reliable in the record to be admitted. As more recent cases show, there is no such requirement. *See Elbit*, 927 F.3d at 1299-1300; *Prism*, 849 F.3d at 1370; *Rembrandt Wireless Techs., LP v. Samsung Elecs. Co., Ltd.*, 853 F.3d 1370, 1381 (Fed. Cir. 2017); *AstraZeneca*, 782 F.3d at 1337.[7]

Nevertheless, Plexxikon is correct that the settlement licenses here do not appear to be particularly probative. First, they do not involve the asserted patents and Novartis has not shown that the technology is comparable. *See ResQNet.com*, 594 F.3d at 869 (cautioning against reliance on past licenses for technologies other than the patent in suit); *LaserDynamics*, 694 F.3d at 79 (finding "vague comparability between different technologies" insufficient). Second, they were entered into early in the cases, and Mr. Malackowski expressly opines that Novartis agreed to the licenses to avoid litigation. The second factor of the "transaction costs of further litigation" is thus a dominant factor in the license values. *Prism*, 849 F.3d at 1369. Third, Mr. Malackowski introduces no evidence that Novartis actually infringed the licensed patents or that the value of potential infringement was comparable to the reasonable value here. Finally, Novartis' 30(b)(6) witness testified that the patents in the Curtis license were invalid, which means that the patentee further discounted the royalty amount to account for a potential judgment of invalidity if the case continued to trial. The probative value of these licenses is thus limited while the risk of prejudice from skewed damages horizons before the jury is significant. *See Prism*, 849 F.3d at 1370

---

[6] By contrast, the *LaserDynamics* court excluded a settlement license because it was "the least reliable license by a wide margin." 694 F.3d at 77-78.

[7] Plexxikon, again, cites *Prism* in its brief, but ignores its implications for its argument.

11

(permitting exclusion of licenses under Rule 403).[8]

Novartis' evidence for comparability only weakly ties those licenses "to the facts of the case." *Summit 6*, 802 F.3d at 1296. Although Mr. Malackowski purports to opine on the comparability of the license terms, products, patents, and negotiation positions, much of that evidence is superficial or insufficient to show comparability. For example, Mr. Malackowski opines that the product licensed under the Rigel agreement, Zykadia, is comparable to Tafinlar even through it makes only a fraction of the sales. Malackowski Report at 48. The Curtis and Harvard licenses also relate to different technology and cover products that made less than 5% of Tafinlar's sales. *Id.* at 60-61, 70. Moreover, the comparability of the patents in all three cases is based on their breadth and relation to each other, rather than the value of the inventions. *Id*. at 49. To be sure, Mr. Malackowski does provide some evidence of comparability, particularly from Novartis' perspective (where each license provides "freedom to operate" for an already-existing product). *Id*. at 107-08. However, in light of the litigation-focused circumstances of the negotiations of the licenses, as well as the differences of the licensed products and technology, the probative value in those licenses is outweighed by the risk of undue prejudice. Fed. R. Evid. 403.[9]

Accordingly, the Court **GRANTS** Plexxikon's motion to exclude Mr. Malackowski's testimony regarding the Rigel, Curtis, and Harvard licenses.

### B.     Genus Patents

Plexxikon argues that Mr. Malackowski should not be permitted to testify that a broad genus patent is less valuable than a narrower one that identifies specific compounds. The issue is

---

[8] Although the Harvard license was not made in the context of litigation, Novartis' 30(b)(6) witness testified that the company agreed to the license because "it would be cheaper to take the license than risk litigation for freedom to operate purposes." Waibel Depo. at 207:25-208:3. The Harvard license is therefore most probative of litigation costs, not the value of the technology.

[9] Plexxikon also argues that the settlement licenses are inadmissible under Rule 408. However, the Federal Circuit has recognized that settlement licenses are "sometimes [] admissible and sometimes [] not" and "can be pertinent to the issue of reasonable royalties." *Prism*, 849 F.3d at 1368-69; *In re MSTG, Inc.*, 675 F.3d 1337, 1348 (Fed. Cir. 2012). Because discoverability of information related to reasonable royalties implicates that circuit's exclusive jurisdiction, Federal Circuit law is likely to apply to the admissibility question at issue here as well. *MSTG*, 675 F.3d at 1341.

12

closely related to the one regarding apportionment discussed *supra* section III.A. Namely, Plexxikon argues that the value of a patent is commensurate with its ability to exclude, while Novartis argues that a broad genus patent provides less of an "inventive contribution" than a patent identifying specific useful compounds.

The Court finds, again, that this issue is properly resolved by a proper application of the *Georgia-Pacific* factors. The need for additional development rests, in large part, on the date of the hypothetical negotiation. *See Integra Lifesciences I, Ltd. v. Merck KGaA*, 331 F.3d 860, 870-71 (Fed. Cir. 2003), *rev'd on other grounds* 545 U.S. 193 (2005); *Hitkansut LLC v. U.S.*, 130 Fed. Cl. 353, 393-94 (Ct. Fed. Cl. 2017). In *Integra*, the patents concerned certain peptide sequences that the accused infringer tested as part of its own, largely independent discovery. 331 F.3d at 862-63. The Federal Circuit analyzed the peptides as a "research tool" and concluded that their value depended on the date of the negotiation: "At the point before Merck even attempted its first test on [the peptide], it would have assumed all the risks of failure—either scientific failure to identify a suitable therapeutic candidate or economic failure to market a successful product," while using the tool "to confirm an already recognized drug candidate's safety or efficacy" would result in a different valuation. *Id.* at 870-71 & n.4. Similarly, in *Hitkansut*, the Court of Federal Claims found that a hypothetical negotiation for patents that provide only "potential" benefits depends on the state of development and commercialization. 130 F. Cl. at 393-94. Thus, the value of patents that require additional development to commercialize rests on the state of the development at the time of the hypothetical negotiation. In all instances, evaluation of the patents must be tied to the facts of the case—broad statements about the value of genus patents in the abstract are largely not helpful. *See Uniloc USA*, 632 F.3d at 1315.

Here, the parties appear to agree that the hypothetical negotiation would take place after Novartis already developed Tafinlar, which might increase its willingness to pay. However, Mr. Malackowski provides his opinion as part of the apportionment analysis to distinguish Novartis' own contribution and to show the non-comparability of the Roche license, which identified specific compounds. These are reasonable ways of analyzing the issues, even if more abstract statements concerning the value of genus patents as a whole would not be helpful. Accordingly,

13

the Court **DENIES** this part of Plexxikon's motion.

**V.  CONCLUSION**

For the foregoing reasons, the Court **DENIES** Novartis' motion to exclude the testimony of Dr. Leonard and **GRANTS IN PART** and **DENIES IN PART** Plexxikon's motion to exclude the testimony of Mr. Malackowski.

**IT IS SO ORDERED.**

Dated:  1/12/2021

HAYWOOD S. GILLIAM, JR.
United States District Judge