UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PLEXXIKON INC.,<br><br>Plaintiff,<br><br>v.<br><br>NOVARTIS PHARMACEUTICALS CORPORATION,<br><br>Defendant. | Case No. 17-cv-04405-HSG<br><br>**ORDER REGARDING PLAINTIFF'S MOTION IN LIMINE NO. 1 AND DEFENDANT'S MOTIONS IN LIMINE NOS. 2, 3, AND 4**<br><br>Re: Dkt. Nos. 259, 269, 270, 271 |

The Court rules on the pending motions in limine ("MIL") described below as follows, and will continue to issue rulings on the remaining MILs on a rolling basis.

## I. BACKGROUND

These MILs relate to the same issue: unasserted related inventions. As relevant, the asserted patents arose from Plaintiff Plexxikon's work on selective B-Raf inhibitors. B-Raf is a type of protein whose mutations frequently cause cancer. Although inhibiting kinase is desirable, doing so nonselectively is toxic. Plexxikon succeeded in developing inhibitors that selectively target mutated B-Raf in 2004, in work that eventually led to the drug Zelboraf.

As characterized by Plexxikon, its scientists were initially unsure about what caused Zelboraf's selectivity.[1] Zelboraf includes two major elements: a bicyclic ring called azaindole and a sulfonamide attached to a halogenated phenyl. Plexxikon's scientists initially believed that the azaindole was the key the molecule's effectiveness. However, in March 2004, Plexxikon biochemist James Tsai proposed in an email a "new scaffold" that replaces the bicyclic ring with something like pyridine—a monocyclic heteroaryl. The resulting compound was similarly

---

[1] *See* Dkt. No. 367 ¶¶ 1-14. Novartis does not object to the introduction of this general narrative at trial. *See* Dkt. No. 380 at 5.

effective, and Plexxikon retroactively labelled the sulfonamide connected to a halogenated phenyl the "core molecular structure."[2] Plexxikon's B-Raf inhibitor work thus led to two breakthroughs with the "core molecular structure": an azaindole-based series and a monocyclic heteroaryl-based series. The latter patents are asserted in this case; the former are not.

At the same time that Plexxikon was developing its B-Raf inhibitors, third party GlaxoSmithKline ("GSK") was working on its own selective B-Raf inhibitors. According to Plexxikon, GSK was not successful, and the program was at one point abandoned.[3] GSK's fortunes changed when Plexxikon reached out about a possible collaboration to develop Zelboraf (the azaindole-based compound). GSK responded enthusiastically and eventually obtained samples of Zelboraf, which it proceeded to test against its own drug candidates. GSK further examined Plexxikon's patent applications, which included the Zelboraf compound. Although Plexxikon ultimately decided to license Zelboraf to Hoffman-La Roche ("Roche"), GSK shifted its own research to focus on compounds containing sulfonamide. That work eventually led to Tafinlar, the accused product in this case. Tafinlar practices Plexxikon's monocyclic heteroaryl-based patents, but not the azaindole-based patents.

Defendant Novartis Pharmaceuticals Corporation ("Novartis") acquired Tafinlar from GSK in 2015. Prior to that time, Novartis developed its own B-Raf inhibitor, Braftovi, that has a similar "core molecular structure" but is not alleged to infringe any patents. Plexxikon alleges, however, that Novartis similarly examined Plexxikon's publications and patent applications in developing Braftovi. Thus, there are three B-Raf drugs on the market: Zelboraf, Tafinlar, and Braftovi. All three share the alleged "core molecular structure," but only Tafinlar infringes (without dispute) the patents asserted in this case.

---

[2] It is unclear whether the "core molecular structure" label arose in the context of litigation. The contemporaneous documents refer to a "scaffold" that apparently differs from the "core molecular structure" because it includes a monocyclic heteroaryl. *See* Dkt. No. 299-2 ¶ 28.

[3] *See* Dkt. No. 369 at 4-11. GSK witnesses deny copying anything. *See* Dkt. No 375 at 10.

## II. NOVARTIS' MIL NO. 2

Novartis' MIL No. 2 seeks to preclude Plexxikon from "mentioning or offering any evidence relating to patents or patent claims that are not asserted in this litigation as evidence of the validity of the asserted patents." Dkt. No. 269 at 1. Specifically, Novartis argues that Plexxikon should not be permitted to introduce evidence of unrelated patents, including Novartis' own patents, to argue for validity of the broad asserted patents. Plexxikon responds that it should be permitted to cross-examine Novartis' witnesses on their own broad patents if they suggest that the asserted patents are invalid because they cover "trillions of potential compounds" under Federal Rules of Evidence 613(b) and 801(d)(1)(A). *See* Dkt. No. 294 at 1.

The motion is **GRANTED**. "[T]he fact that others have obtained [similar] patents is irrelevant on the questions of the patentability." *In re King*, 107 F.2d 618, 620 (C.C.P.A. 1939). Although prior inconsistent statements may be used for impeachment, none of the witnesses here actually hint that broad patents are per se invalid. Instead, Novartis' technical expert Dr. Baran acknowledged that broad patents are "precedented" in the industry and rejected a "per se" rule of breadth as invalidity in his deposition. *See* Dkt. No. 294-4 ("Baran Depo.") at 180:21-25, 181:17-22. The validity experts Dr. Natarajan and Dr. Jennings similarly acknowledged that broad genus claims are "common" and "typical" in the field. *See* Dkt. No. 364-7 at 97:8-18; Dkt. No. 364-8 at 66:10-13. Novartis' damages expert, Dr. Malackowski, did not opine on invalidity at all but only on the relative worth of broader "freedom to operate" licenses. Dkt. No. 402-6 at 36:21-38:6.

Novartis' own argument appears to rest less on breadth than on enablement and written description. *See* Dkt. No. 269 at 2 (acknowledging as "well-established" that "one may obtain a patent on a genus (regardless of breadth) as long as one provides support in the specification to show possession of the claimed genus and to allow a person of ordinary skill at the relevant time to make and use the claimed genus"); *see also* Dkt. No. 364-9 ¶ 80 (opining on breadth in relation to enablement); Dkt. No. 364-10 ¶ 19 (same). Thus, to the extent that Novartis' witnesses suggest that broad patents are invalid independent of those requirements, Plexxikon may impeach them

using their own (and Novartis') prior inconsistent statements.[4] Otherwise, evidence of unrelated patents is likely to cause confusion and waste time as the parties dispute the comparability of those patents, and is thus excluded under Federal Rule of Evidence 403.

### III. NOVARTIS' MIL NO. 3

Next, Novartis' MIL No. 3 addresses compounds not covered by the asserted patents. Novartis seeks to preclude Plexxikon from (1) describing the "core molecular structure" as its "invention," (2) "mentioning or introducing any evidence describing the chemical structure of Zelboraf," including its "core molecular structure," (3) "relying on Zelboraf . . . for any secondary considerations of non-obviousness," (4) "mentioning" Zelboraf "in connection with the development of the inventions of the Asserted Patents," (5) "mentioning or presenting evidence regarding patent applications covering Zelboraf," (6) "mentioning or introducing any evidence describing the chemical structure of Braftovi," including its "core molecular structure," and (7) "presenting any evidence pertaining to the development of Braftovi." Dkt. No. 270 at 1.

The Court ordered Plexxikon to submit an offer of proof regarding its intended evidence and argument as to these issues. There, Plexxikon explains that it intends to use the evidence about related compounds to explain its development story for the asserted patents, as well as to rebut Novartis' arguments for lack of enablement, obviousness, and damages. *See* Dkt. No. 367. In response, Novartis agrees that Plexxikon may "tell the story that its B-RAF program started with its azaindole series, and that in March 2005 its scientists decided also to pursue a different class of compounds with this 'core molecular structure' as the 'scaffold' which they later included in the compounds claimed in the Asserted Patents." *See* Dkt. No. 380 at 5. However, Novartis contends that any further discussion of compounds not covered by the asserted patents would be prejudicial because they relate to different "inventions."

The Court recognizes the significant potential for prejudice and confusion from evidence about compounds not covered by the asserted patents. "It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude."

---

[4] Significantly, Novartis indicates that it does not intend to make this argument. Dkt. No. 379 at 1.

4

*Innova / Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004). Individual elements of a patent claim—no matter how important to the invention—are not entitled to protection. *See Aro Mfg. Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 345 (1961); *see also Mercoid Corp. Minn.-Honeywell Regulator Co.*, 320 U.S. 680, 684 (1944) ("The fact that an unpatented part of a combination patent may distinguish the invention does not draw to it the privileges of a patent. That may be done only in the manner provided by law. However worthy it may be, however essential to the patent, an unpatented part of a combination patent is no more entitled to monopolistic protection than any other unpatented device.").[5]

Related inventions similarly have no bearing. The parties agree that both Zelboraf and Braftovi are covered by patents different than the ones asserted. They therefore relate to different inventions that must be analyzed separately from the asserted patents. *See Comair Rotron, Inc. v. Nippon Densan Corp.*, 49 F.3d 1535, 1539 (Fed. Cir. 1995) ("[S]eparate patents describe 'separate and distinct inventions,' and it cannot be presumed that related patents rise and fall together." (citation and brackets omitted)). Because the products differ in how they meet claim limitations, their overlap as to some limitations makes no difference. *See Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29 (1997) ("Each element contained in a patent claim is deemed material to defining the scope of the patented invention.").

Here, permitting Plexxikon to refer to the "core molecular structure" as its invention would prejudice Novartis by conflating the patented inventions with Plexxikon's overall contributions to the field. This would shift the trial's focus from a narrow inquiry regarding claim validity to a broad referendum on Plexxikon's innovation in developing selective B-Raf inhibitors. That is improper: no matter how laudable Plexxikon's efforts, the validity inquiry must focus on individual claims. *See Nat'l Steel Car, Ltd. v. Canadian Pac. Ry., Ltd.*, 357 F.3d 1319, 1334 (Fed. Cir. 2004); *see also Aro*, 365 U.S. at 345 (finding "no legally recognizable or protected 'essential'

---

[5] Novartis claims that the "core molecular structure" was dedicated to the public. *See Johnson & Johnson Assoc. Inc. v. R.E. Serv. Co., Inc.*, 285 F.3d 1046, 1054 (Fed. Cir. 2002) (en banc). That doctrine—which refers to features that are disclosed but not claimed, not those that are claimed along with other limitations—does not clearly apply in this case. *See id.*; *see also infra* § V (Plexxikon's MIL No. 1). However, Novartis' general point is valid: the patents here are narrower than the "core molecular structure."

element, 'gist' or 'heart' of the invention in a combination patent"). For similar reasons, references to Zelboraf and Braftovi—whose only relevance is the elements shared with the asserted patents—are likely to unfairly prejudice Novartis by broadening the apparent invention at issue in this case.

In addition, references to the "core molecular structure" are highly likely to create confusion. A central issue in this case relates to the date of conception of the asserted patents. *See* Dkt. No. 450. During summary judgment briefing, Plexxikon argued that it conceived the claimed inventions in 2005 based on James Tsai's email describing a "new scaffold." *See* Dkt. No. 212 at 14. The "core molecular structure," however, does not clearly correspond to the "new scaffold*.*" *Compare* Dkt. No. 177 at 7 (showing the "scaffold" as including the monocyclic heteroaryl), *with* Dkt. No. 369 at 5 (referring to "arylsuflonamide" as the core structure without the heteroaryl).[6] The distinction was confusing at summary judgment and is likely to create confusion for the jury. It is also likely to be prejudicial: conception here requires showing a "preference" for monocyclic heteroaryl compared to other "X" groups. *See* Dkt. No. 450 at 13 & n.6. Because the alleged "core molecular structure" includes *all* heteroaryls in some formulations, any confusion is likely to result in a finding of an earlier conception date than is supported by law.

The Court therefore **GRANTS** Novartis' motion with respect to Plexxikon's case-in-chief. Plexxikon may not describe the "core molecular structure" as its invention or introduce evidence about Zelboraf or Braftovi to equate those compounds or their properties to the asserted patents. As noted above, Plexxikon may still explain its development story as it relates to Plexxikon's work on selective B-Raf inhibitors. Plexxikon may also introduce evidence about the relative importance of various subcomponents to the claimed compounds' effectiveness. With respect to Plexxikon's potential rebuttal case and its cross-examination of Novartis' witnesses, the Court

---

[6] Plexxikon's description of the "core molecular structure" has shifted over time. In some briefs, it refers to the "core" structure as "a sulfonamide attached to a halogenated phenyl." Dkt. No. 369 at 8. In others, Plexxikon includes bicyclic and monocyclic heteroaryls as well. Dkt. No. 212 at 3; Dkt. No. 296 at 2:5-7. That the Court still cannot determine the precise boundaries of the purported "core molecular structure" after multiple rounds of briefing demonstrates the potential for confusion.

rules as follows:

Enablement: Novartis argues that the asserted patent claims are not enabled because "more than half of the compounds of the claimed genus are likely to be inoperable," thus requiring extensive experimentation to determine operability. Dkt. No. 380 at 6. Plexxikon responds that it should be permitted to impeach witnesses on this topic by showing that selective B-Raf inhibition arises from the "core molecular structure," as opposed to the optionally substituted R groups that create the broad range of alternatives. Dkt. No. 367 at 19.

As noted above, Plexxikon may introduce evidence about subcomponents that cause the *claimed* compounds' effectiveness. That does not require evidence about Zelboraf or Braftovi. If Plexxikon is correct that the claimed compounds are operable because they contain a "core molecular structure," Plexxikon may simply rely on the evidence supporting that view, including experiments that arose from testing Zelboraf.[7] However, there is no need to describe those drugs specifically, as any such descriptions are likely to cause confusion and conflate the issues, and specific evidence regarding the structure of Zelboraf and Braftovi is excluded under Rule 403.

Secondary Considerations of Non-Obviousness: Novartis contends that the claimed compounds are obvious over prior art. Plexxikon responds, in part, by relying on secondary considerations of non-obviousness. In particular, Plexxikon points to the commercial success of Tafinlar, which embodies the asserted patents, as evidence that the combination was not obvious (because if it was, someone else would have created it first and reaped the rewards). *See Merck & Co., Inc. v. Teva Pharmas. USA, Inc.*, 395 F.3d 1364, 1376 (Fed. Cir. 2005). Novartis contends that Tafinlar's success arose from other factors. Plexxikon then claims that evidence of Zelboraf's success is necessary to rebut Novartis' argument by showing that all drugs with the "core molecular structure" were successful. Last, Novartis responds that the "core molecular structure" cannot form the required "nexus" because it was found in the prior art. *See Novartis AG v. Torrent Pharmas. Ltd.*, 853 F.3d

---

[7] The Court notes that Plexxikon's evidence that the "core molecular structure" causes the compounds' effectiveness appears to rely on individual subcomponents (such as the sulfonamide). *See* Dkt. No. 367 at 11. To the extent that the subcomponents, rather than the overall structure, cause the compounds' selectivity or potency, introducing evidence of the "core molecular structure" is likely to overstate its contribution.

7

1316, 1330-31 (Fed. Cir. 2017).

The complicated chain of logic here demonstrates that any mention of Zelboraf must proceed with caution. As an initial matter, the dispute raises the question of whether the "core molecular structure" was known in the prior art. As explained below in the discussion of Plexxikon's MIL No. 1, Novartis has not conclusively shown this to be the case, and Plexxikon may argue that the "core molecular structure" was the novel aspect of the claims. That does not, however, mean that Plexxikon's proffered Zelboraf evidence is admissible as to secondary considerations of non-obviousness. "A patent claim is not coextensive with a product that includes a 'critical' unclaimed feature that is claimed by a different patent and that materially impacts the product's functionality." *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1375 (Fed. Cir. 2019). To be relevant, Zelboraf must therefore not only share the key inventive feature of the asserted patents, but must also lack other features that could impact commercial success. Because the patents covering Zelboraf are not asserted, this evidence would take the jury far from the central issues of this case and would likely waste time and create confusion. Accordingly, Plexxikon may not directly rely on Zelboraf's commercial success to rebut Novartis' claim of obviousness.

However, to the extent that Novartis opens the door by attributing Tafinlar's success to features other than the shared molecular elements, Plexxikon may offer evidence that Zelboraf succeeded despite not having those features. Before any such evidence is offered, Plexxikon will be required to submit a proposed limiting instruction directing the jury not to attribute Zelboraf's success to the asserted patents.

<u>Damages</u>: Plexxikon claims that it is entitled to a reasonable royalty no less than the royalty paid by Roche under the Zelboraf license. Under Plexxikon's theory of damages, Plexxikon would not have accepted a lower royalty in a hypothetical negotiation because Tafinlar competes directly with Zelboraf and thus deprives Plexxikon of Roche's royalties. Plexxikon also claims that evidence of the "core molecular structure" is relevant to damages by showing the "extent to which the infringer has made use of the invention." Dkt. No. 367 at 22-23. Novartis responds that it does not seek to exclude evidence regarding the Roche license for Zelboraf, but that its chemical structure is not relevant because, at a minimum, the "core molecular structure" is dedicated to the public. Dkt. No. 380 at 10.

As explained with respect to Plexxikon MIL No. 1, the Court is not persuaded by Novartis' public dedication argument. Even if the "core molecular structure" is not the invention, it is still a part of the claimed invention whose value may be apportioned to the asserted patents.[8] Nevertheless, the Court again agrees that Zelboraf's chemical structure is not relevant to that determination. As noted above, Plexxikon may provide evidence about subcomponents causing the claimed compounds' effectiveness without relying on related inventions or implying that the subcomponents are coextensive with its invention. Unless Novartis opens the door by challenging the technical comparability of the Roche licensed products, Zelboraf's chemical structure is not relevant to damages and would only cause confusion. Thus, Plexxikon may introduce evidence of the Roche license for Zelboraf and may explain the importance of the claimed invention to Tafinlar's effectiveness, but may not otherwise discuss Zelboraf's chemical structure unless Novartis opens the door.

Accordingly, the Court **GRANTS** Novartis' MIL No. 3 as described above.

## IV. NOVARTIS' MIL NO. 4

Next, Novartis' MIL No. 4 seeks to preclude Plexxikon from offering "evidence or argument so as to suggest that GSK or Novartis copied Plexxikon's inventions." Dkt. No. 271 at 1. This includes evidence of GSK's interactions with Plexxikon about a possible collaboration to develop Zelboraf and the related transmission of samples. It also includes Novartis' evaluation of the Zelboraf formula in patent applications and publications while developing Braftovi. Plexxikon responds that this evidence is necessary to rebut Novartis' narrative of independent development of the accused product. *See* Dkt. No. 369 at 12. Plexxikon also claims that copying is relevant to damages, secondary considerations of non-obviousness, and willfulness.

As with Novartis' MIL No. 3, the Court recognizes significant potential for prejudice and confusion in permitting this evidence. The law does not discourage copying as a general matter. *See TrafFix Devices, Inc. v. Marketing Displays, Inc.* 532 U.S. 23, 29 (2001). On the contrary, the Supreme Court has recognized that "[a]llowing competitors to copy will have salutary effects in

---

[8] As noted above, Plexxikon's formulation of the "core molecular structure" has differed, and some formulations are broader than the asserted claims. The Court here refers only to the claimed features and again strongly urges the parties to strive for clarity when using shorthand labels to refer to subcomponents of the claimed compounds.

9

many instances," as "[r]everse engineering of chemical and mechanical articles in the public domain often leads to significant advances in technology." *Id*. (quoting *Bonita Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141 160 (1989)). Patent law is thus designed to protect the public's right to copy as much as to protect the patentee's limited monopoly. *See Bonita Boats*, 489 U.S. at 151; *see also Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 232 (1964) (noting that a party "had every right to copy" articles from expired patents).

Here, the parties agree that neither GSK nor Novartis copied the asserted patents or any product covered by those patents. Instead, Plexxikon contends that GSK and Novartis copied *related* patent applications, publications, and product samples that share certain features with the asserted patents. The alleged copying notably did not result in infringement of the related patents. Nonetheless, evidence of copying is likely to unfairly prejudice Novartis by suggesting to the jury that it did something wrong. As described in the discussion of Novartis' MIL No. 3, it is also likely to shift the focus from the asserted patents to Plexxikon's overall contributions to the field.

That said, despite the potential for prejudice and confusion, the Court recognizes that copying is relevant to multiple issues. Rule 403 prohibits only evidence whose potential for unfair prejudice "substantially outweighs" its probative value. Fed. R. Evid. 403. Thus, because the probative value is not so outweighed as to the limited purposes below, the Court **GRANTS** Novartis motion, except that the evidence may be used as follows:

Independent Development: To the extent that Novartis suggests that GSK developed Tafinlar without contributions from others, Plexxikon may cross-examine the witnesses to obtain admissions that GSK relied on research and development contributed by Plexxikon to the field. However, Plexxikon may not refer to the collaboration discussions with GSK or GSK's testing of Zelboraf samples, as the collaboration involved different products and inventions not directly relevant to this case.

Damages: Novartis' damages expert, Dr. Malackowski, contends that the asserted patents have low value because they act merely as a "toll gate through which Novartis must pass to secure freedom to operate," while it "independently researched, developed, and successfully commercialized the Accused Product." Dkt. No. 405-6 at 96. The evidence of copying tends to

10

disprove that claim by showing that GSK derived valuable insight from Plexxikon's work on sulfonamide and fluorine. Because the asserted patents specifically disclose those components, they presumably provide value in guiding development beyond being a mere "toll gate."[9]

Thus, to the extent that Novartis intends to argue that the asserted patents had no value for identifying promising lead drug candidates, Plexxikon may introduce evidence that GSK and Novartis studied Plexxikon's publications and patent applications, including the precise elements that later became part of the asserted claims, to develop lead compounds.

Secondary Considerations of Obviousness: Novartis argues that U.S. Patent No. 4,595,780 to Shionogi et al. ("Shionogi") renders the claimed compounds obvious. Shionogi lacks a fluorine required by the claims, but Novartis expert Dr. Baran opines that it would have been obvious to add one. Plexxikon seeks to introduce evidence of copying in part to show that GSK incorporated the fluorine into its products only after reviewing Plexxikon's patent applications.

Generally, copying is relevant to non-obviousness because if a party needs to copy the patentee rather than the prior art, the latter presumably does not provide enough guidance to make the invention. *See, e.g.*, *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1541 (Fed. Cir. 1983) ("An alleged infringer's lauding of all the available prior art may, for example, in some cases have a hollow ring when played against its disregard of that art and its copying of the invention."). Copying thus plays a dual role of "praising" the invention and suggesting that the prior art was insufficient. *See id.*; *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1336 (Fed. Cir. 2016).

Novartis argues that copying is only relevant when an embodiment of the claims is copied. The Court disagrees. Novartis is correct that copying features that are not part of the claims at all is irrelevant. *See Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1366 (Fed. Cir. 2001). But where, as here, a party copies the precise claimed feature that it later contends to be obvious (e.g., the fluorine), copying is relevant as rebuttal evidence. Put another way, if the prior

---

[9] Novartis again claims that the "core molecular structure" was dedicated to the public. The Court addresses the argument below in discussing Plexxikon's MIL No. 1. Regardless, the evidence here is relevant because Novartis' and GSK's interest in the precise features that were incorporated into the asserted patents suggests that those features have value for identifying lead compounds. That directly contradicts Dr. Malackowski's claim that the asserted patents have "minimal value" compared to the Roche licensed patents that identify specific lead compounds.

11

art already suggested the "obvious" feature, the accused infringer would have copied that prior art, not the patentee's work. *See Panduit Corp. v. Dennison Mfg. Co.*, 810 F.2d 1561, 1571-72 (Fed. Cir. 1987). Here, Plexxikon's theory is that GSK would have copied Shionogi (rather than Plexxikon's publications) if that reference rendered the fluorine obvious.

Novartis separately argues that copying of the "core molecular structure" lacks nexus to the asserted patents because it was "dedicated to the public." Generally, copying is only relevant to non-obviousness if it relates to "what is both claimed and *novel* in the claim." *Novartis*, 853 F.3d at 1330-31 (emphasis in original) (quoting *In re Kao*, 639 F.3d 1057, 1068 (Fed. Cir. 2011)). As described below in the discussion of Plexxikon's MIL No. 1, Novartis has not met its burden to show that the "core molecular structure" was *not* the novel aspect of the claims (i.e., that it was found in the prior art).[10] Thus, Plexxikon may argue that the "core molecular structure" was the novel aspect of the claims sufficient to form a nexus for secondary considerations of non-obviousness.

Willful Infringement: Plexxikon last contends that copying is relevant to willful infringement in several ways. First, it suggests awareness of the asserted patents because GSK may have conveyed information to Novartis and because Novartis' own review of Plexxikon's patent applications suggests it was closely tracking the company's work. Second, it suggests a "culture of copying" that may weigh in favor of enhanced damages. *See WCM Indus., Inc. v. IPS Corp.*, 721 F. App'x 959, 971-72 (Fed. Cir. 2018).

The Court finds that the probative value of this evidence is substantially outweighed by its risk of unfair prejudice and confusion of the issues. Viewed in the most culpable light, the above-described narrative suggests Novartis' knowledge of the *Zelboraf* patents (based on the azaindole series), not the asserted ones. Mere awareness of a patent portfolio is not sufficient to show knowledge of a specific patent. *See Finjan, Inc. v. Cisco Sys., Inc.*, No. 17-0072, 2017 WL 2462423, at *5 (N.D. Cal. June 7, 2017). Moreover, Novartis did not ultimately infringe the

---

[10] Once more, the Court uses Plexxikon's label only as a shorthand for the sulfonamide connected to a halogenated phenyl. Plexxikon may use such labels at trial, provided that they refer to claim elements and are not used to conflate the related inventions.

12

1    Zelboraf patents, but instead (allegedly) copied a Zelboraf feature while creating its own

2    competing product. This is thus no more than "the familiar picture of competitors competing, one

3    trying to match a new product of the other with a new product of its own," which cannot show

4    willful infringement through the copying of the same "inventive concept." *State Indus., Inc. v.*

5    *A.O. Smith Corp.*, 751 F.2d 1226, 1235 (Fed. Cir. 1985); *cf. TrafFix*, 532 U.S. at 29 (copying is

6    not "discouraged or disfavored by the laws").

7    Ultimately, the point of willful infringement is to deter conduct that is "willful, wanton,

8    malicious, bad-faith, deliberate, consciously wrongful, flagrant, or—indeed—characteristic of a

9    pirate." *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S.Ct. 1923, 1930 (2016). Copying of related

10   products covered by different patents in a way that does not infringe those patents amounts to, at

11   best, weakly probative evidence of conscious malfeasance. In light of the high risk of unfair

12   prejudice and confusion of the issues, the evidence and argument advanced for this purpose are

13   excluded under Rule 403.

14   Accordingly, the Court **GRANTS** Novartis' MIL No. 4 except as described above.

## V. PLEXXIKON'S MIL NO. 1

Plexxikon Inc.'s MIL No. 1 seeks to preclude Novartis "from presenting evidence or argument related to invalidity not included in its invalidity contentions, including any argument that Plexxikon's commercialized drug Zelboraf (vemurafenib) is prior art to the claims of the Asserted Patents or that publications not charted in its contentions anticipate or render obvious any such claims." Dkt. No. 259 at 1. Novartis responds that it does not seek to introduce new invalidity theories but only to rebut Plexxikon's arguments conflating Zelboraf and the "core molecular structure" with the claimed inventions. Dkt. No. 375 at 2-3. Novartis has provided an offer of proof detailing its intended arguments and evidence as to this issue. *See id.*

Plexxikon's precise quarrel with Novartis' offer of proof is unclear. On the one hand, Plexxikon seeks to prevent Novartis from characterizing Zelboraf as prior art. *See* Dkt. No. 382 at 1. On the other hand, Plexxikon does not object to the evidence in Dr. Baran's invalidity report quoted in Novartis' offer of proof, which includes statements that "[t]he invention of [Zelboraf] occurred prior to [the] priority date of the Asserted Patents," such that it is "among such prior [art]

inhibitors." *Id.* at 6; Dkt. No. 375 at 3-4; *see also* Dkt. No. 375 at 3 (¶ 52) (Dr. Baran opining that Zelboraf is prior art to the asserted patents). Plexxikon generally argues that Novartis has not shown Zelboraf to be prior art and that the issue is not relevant. *See* Dkt. No. 382 at 4-6.

As an initial matter, the Court finds that Zelboraf's and the related publications' status as prior art is relevant. As described above, Novartis repeatedly argues that Plexxikon "dedicated to the public" the "core molecular structure" that Plexxikon contends make the claimed compounds effective. For instance, Novartis claims that the "core molecular structure" cannot provide a nexus for secondary considerations of non-obviousness because it was "in the public domain" and thus not a "novel" aspect of the claims. *See* Dkt. No. 381 at 5-6. Similarly, Novartis argues that the "core molecular structure" cannot contribute to the "incremental value" of the asserted patents for purposes of damages apportionment. *Id*. at 9.

Although Novartis frames these arguments as going to "public dedication," that doctrine is not applicable here. Public dedication concerns whether a patentee can extend claims to cover alternative implementations that were disclosed but not claimed. *See Johnston & Johnston*, 285 F.3d at 1054. Here, on the other hand, Plexxikon specifically claimed the structure that Tafinlar infringes in a separate patent, so there is no credible argument that Plexxikon dedicated it to the public. Instead, Novartis' arguments plainly depend on the "core molecular structure" being part of the prior art, such that Plexxikon cannot claim it to be the "novel" or "inventive" aspect of the asserted claims. *See Novartis*, 853 F.3d at 1330-31 (requiring nexus to the "novel" aspect of the claims); *Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prods. Grp., LLC*, 879 F.3d 1332, 1348 (Fed. Cir. 2018) (requiring damages apportionment between "the patented improvement and the conventional components" of the claims).

For the reasons stated by Plexxikon, Novartis has not conclusively shown that Zelboraf or the related publications are prior art at this stage.[11] *See* Dkt. No. 381 at 1-3. However, that does not mean that Novartis may not try to establish as much at trial. As explained above, Plexxikon

---

[11] Although Novartis does not respond to Plexxikon's argument, its priority claims appear to rest on Plexxikon's failure to establish a March 2005 priority date. *See* Dkt. No. 375 at 3. The priority date is disputed, and Novartis may show that Zelboraf is prior art even if it was not synthesized until after that date.

14

may argue that the "core molecular structure" formed the inventive aspect of the claims for purposes of damages and secondary considerations of non-obviousness. Novartis may then attempt to rebut that claim by showing that the "core molecular structure" was found in the prior art. Plexxikon's main basis for exclusion—failure to include the references in invalidity contentions—only applies to references that Novartis contends "anticipate[] each asserted claim or render[] it obvious." Patent L.R. 3-3(a). Here, by contrast, Novartis intends to use Zelboraf and the related publications only to rebut Plexxikon's contention that it discovered the "core molecular structure," so as to make Zelboraf relevant to secondary considerations of non-obviousness. *See* Dkt. No. 375 at 41, 9-18. Because such arguments are not precluded by the Patent Local Rules, exclusion is not appropriate (assuming Novartis can show that the proffered evidence was timely and adequately disclosed as required by the Rules of Civil Procedure and the Court's scheduling order).

Accordingly, the Court **DENIES** Plexxikon's MIL No. 1.[12]

**IT IS SO ORDERED.**

Dated: 6/2/2021

HAYWOOD S. GILLIAM, JR.
United States District Judge

---

[12] Given the order of proof proposed by the parties for trial, the parties should be prepared at the pretrial conference to discuss the mechanics of manageably implementing this Order. *See* Dkt. No. 464 at 13 (proposing that Plexxikon present its willfulness and damages case before Novartis' invalidity case).

15