UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PLEXXIKON INC.,<br><br>    Plaintiff,<br><br>v.<br><br>NOVARTIS PHARMACEUTICALS CORPORATION,<br><br>    Defendant. | Case No. 17-cv-04405-HSG<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO STRIKE AND DEFENDANT'S MOTION IN LIMINE NO. 5**<br><br>Re: Dkt. No. 272, 307 |

Pending before the Court are two motions related to Plaintiff Plexxikon Inc.'s damages expert Dr. Gregory K. Leonard, and his reasonable royalty rate calculations. In its motion in limine ("MIL"), Defendant Novartis Pharmaceuticals Corporation moves to preclude Plaintiff from offering evidence relating to damages for any period before October 2016 or after December 2018, the timeframe that Dr. Leonard considered in his opening expert report and his First Supplemental Report. *See* Dkt. No. 272. Defendant also moves to strike Dr. Leonard's Second Supplemental Report, served on October 4, 2019, arguing that it improperly considers damages after 2018. *See* Dkt. No. 307. For the reasons detailed below, the Court **GRANTS IN PART** Defendant's motion to strike and **GRANTS IN PART** Defendant's MIL No. 5.

### I.   BACKGROUND

This is a patent infringement case related to Plaintiff's patents for kinase inhibitors. Plaintiff accuses Defendant's melanoma drug Tafinlar, which Defendant acquired from GlaxoSmithKline ("GSK") in 2015, of infringing U.S. Patent Nos. 9,469,640 (the "'640 Patent") and 9,844,539 (the "'539 Patent"). As relevant to this motion, the parties appear to agree that any damages begin no earlier than October 18, 2016 (the date the '640 Patent issued and thus the date

of the first infringement of the '640 patent),[1] and assuming the claims are valid, the lifetime of the patents-in-suit would extend to 2028.

### A. Damages Contentions

Plaintiff served its damages contentions pursuant to Patent L.R. 3-8 on April 9, 2018. *See* Dkt. No. 333-5, Ex. 4. Plexxikon presented "preliminary" contentions, identifying damages premised on reasonable royalty, convoyed sales, lost royalties, and price erosion theories. *Id.* Plaintiff explained that under the reasonable royalty theory, the royalty *base* would be based on all the sales of Tafinlar in the United States and internationally, to the extent that the active ingredient or final product was exported from the United States. *See id.* at 2. Plaintiff stated that because it did not have Defendant's sales data, however, it could not calculate the royalty base yet. For purposes of the reasonable royalty *rate*, Plaintiff explained that it should be determined by looking at comparable licenses. *See id.* The asserted patents have never been licensed. Instead, Plaintiff identified a 2006 collaboration with Hoffman-La Roche Inc. and F. Hoffman-La Roche Ltd. ("2006 Roche Agreement") as a license that would provide the floor on a reasonable royalty for this case. *Id.* at 2–5, 11. Plaintiff argued that the 2006 Roche Agreement only established a floor because (1) allowing Tafinlar in the marker as "a second competitor" would reduce the sales and sale prices of Plaintiff's own product, Zelboraf (sold by its licensee, Roche); and (2) Defendant would face less risk and less expense in entering the market than Roche did in 2006 due to Plaintiff and Roche's prior efforts. Plaintiff did not, however, identify a specific royalty rate in its damages contentions.

### B. Leonard Expert Reports

Plaintiff served Dr. Leonard's initial expert report on February 4, 2019.[2] In his expert report, Dr. Leonard calculated a reasonable royalty rate to license Plaintiff's patents based on a hypothetical negotiation between the parties occurring in October 2016. *See generally* Leonard

---

[1] Tafinlar was approved by the FDA for the treatment of metastatic melanoma and has been sold in the U.S. since 2013. *See* Dkt. No. 307 at 6.

[2] The parties have provided overlapping excerpts of Dr. Leonard's initial report. All are incomplete. Throughout this order, the Court therefore refers to the excerpts at Dkt. No. 307-3, Ex. 2; Dkt. No. 325-2, Ex. 1; Dkt. No. 327-4, Ex. 3; and Dkt. No. 333-6, Ex. 5, collectively as "Leonard Initial Report."

Initial Report. Dr. Leonard cabined his analysis to what he referred to as the "relevant time period," or the time of the hypothetical negotiation through 2018. *See id* at ¶¶ 43, 56, 68–69, 72–73, 112–13, 155. His reasonable royalty analysis focused primarily on three factors: (1) the 2006 Roche Agreement, which he asserted was the most comparable license, and thus most probative of a reasonable royalty, *see id.* at ¶ 103; (2) lost royalties that Plaintiff would suffer because of Tafinlar sales, *id.* at ¶ 112; and (3) Tafinlar's value to Defendant, *id.* at ¶¶ 56–57.

    Dr. Leonard first identified the floor and ceiling for any reasonable royalty rate for purposes of the hypothetical negotiation. He opined that at the time of the hypothetical negotiation, both parties would have had "walk away points" beyond which they would not have entered into a license. *See id.* at ¶ 45. For Plaintiff, this walk-away point related to the "opportunity cost" of licensing to Defendant, in terms of lost royalties from Plaintiff's own Zelboraf sales. *See id.* at ¶¶ 45, 58–71. Dr. Leonard explained that at the time of the negotiation, Tafinlar and Zelboraf were the only B-Raf inhibitors on the market, and thus were in direct competition. *See id.* at ¶¶ 61–68. Dr. Leonard accordingly opined that in the absence of an agreement with Defendant, Zelboraf would capture the "large majority" of projected Tafinlar sales during the relevant time period. *Id.* Dr. Leonard acknowledged that a third-party therapy, Braftovi, "was expected to compete as a third entrant the market" beginning in 2018. *See id.* at ¶ 72, & n.104. But because it takes time for new entrants to gain market share, Braftovi's forecasted share was relatively small for 2018 and 2019. *See id.* Based on these assumptions, Dr. Leonard concluded that Plaintiff would not have accepted less than a 5.5% royalty rate. *Id.* at ¶ 77. For Defendant, the walk-away point would be the additional profits that it would have expected to earn from using the patented technologies compared to the next-best alternatives. *See id.* at ¶ 45. Dr. Leonard estimated that Defendant would not have agreed to pay a royalty rate greater than 14.6%. *Id.* at ¶¶ 56–57.

    Consistent with Plaintiff's damages contentions, Dr. Leonard also opined that the 2006 Roche Agreement was the most comparable license. *Id.* at ¶ 83. Although the 2006 Roche Agreement and the hypothetical negotiation admittedly involved different patents, Dr. Leonard found that the markets were similar because Zelboraf and Tafinlar serve the same patients through

3

the same mechanism of action. *Id.* at ¶ 103. After accounting for differences between the 2006 Roche Agreement and the hypothetical negotiation, he concluded that the reasonable royalty rate for the patents-in-suit from October 2016 through 2018 would be 6.26% to 12.52%. *Id.* at ¶¶ 68, 103–115, 144. Dr. Leonard then used this range to calculate damages through the end of 2018. *See id.* at ¶ 167. He explained that at the time of his report (February 2019), Defendant had produced only limited data about its 2018 sales figures. *See id.* Dr. Leonard therefore estimated Tafinlar sales through 2018. *Id.* Dr. Leonard calculated damages of $23.5 million to $47 million. *Id.*

Dr. Leonard left open the possibility that he would revise his report. In his report, he stated: "I reserve the right to update my reasonable royalty analysis if Novartis produces additional sales data." *Id.* at ¶ 43, n. 47. Shortly after Dr. Leonard prepared his initial report, Defendant produced the 2018 Tafinlar sales data. *See* Dkt. No. 307 at 9. Dr. Leonard accordingly served his First Supplemental Report on February 21, 2019. *See* Dkt. No. 333-8, Ex. 7. In the two-page report, he applied the royalty rate from his initial report to the actual 2018 Tafinlar sales (the royalty base) to arrive at an updated range of damages from $23.6 million to $47.2 million. *Id.* at ¶ 4.

On August 20, 2019, Defendant notified Plaintiff that it intended to present MIL No. 5, asking the Court to preclude Plaintiff from presenting evidence or argument regarding post-2018 damages "due to the limitations of Dr. Leonard's disclosure and Plexxikon's failure to provide any theory for post-2018." *See* Dkt. No. 307 at 10. Plaintiff then requested 2019 sales data on August 24, 2019. Dkt. No. 333-3, Ex. 2. Defendant produced this data on September 17, 2019. *See* Dkt. No. 333-1 at ¶¶ 10–11. Plaintiff served Dr. Leonard's Second Supplemental Report on October 3, 2019.[3] *See* Dkt. No. 333-12, Ex. 11. In this two-page report, Dr. Leonard stated that he intended to "supplement" his damages calculations "to account for new information that Novartis ha[d] produced" since his initial and First Supplemental Report. *Id.* at ¶¶ 2–3. Dr. Leonard noted that

---

[3] During the June 8, 2021 pretrial conference, Defendant indicated that Plaintiff recently served a Third Supplemental Report from Dr. Leonard. *See* Dkt. No. 488 at 40–41. It argued that the Court's holding on this motion to strike should apply to the third supplemental report as well. *Id.*

4

Tafinlar's 2019 sales data do not affect the royalty rate he calculated in his initial report, but rather simply provide the royalty base to which the royalty rate applies. *See id.* at ¶ 4. He calculated damages from October 2016 to August 2019 at $31.8 million to $63.6 million. *Id.* at ¶ 5. In a footnote and without explanation, Dr. Leonard stated that his initial royalty rates (6.26% to 12.52%) "remain reasonable royalty rates" for purposes of the hypothetical negotiation. *See id.* at ¶ 4, n.2. He noted, however, that the "bottom end of the bargaining range would decrease" and the "top end of the bargaining range would increase." *See id.*

## II. MOTION TO STRIKE

### A. Legal Standard

Federal Rule of Civil Procedure 26 provides that expert disclosures must be made at the times directed by the Court. *See* Fed. R. Civ. P. 26(a)(2)(D). Rule 37, in turn, provides that if a party fails to provide the information required by Rule 26(a), "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or harmless." Fed. R. Civ. P. 37(c)(1). The Court has "particularly wide latitude . . . to issue sanctions under Rule 37(c)(1)." *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001).

Federal Rule of Evidence 702 further provides that a qualified expert may only testify "in the form of an opinion or otherwise" where:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Expert testimony is admissible under Rule 702 if it is both relevant and reliable. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). "[R]elevance means that the evidence will assist the trier of fact to understand or determine a fact in issue." *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007); *see also Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) ("The requirement that the opinion testimony assist the trier of fact goes

primarily to relevance.") (quotation omitted).[4] Under the reliability requirement, the expert testimony must "ha[ve] a reliable basis in the knowledge and experience of the relevant discipline." *Primiano*, 598 F.3d at 565. To ensure reliability, the Court "assess[es] the [expert's] reasoning or methodology, using as appropriate such criteria as testability, publication in peer reviewed literature, and general acceptance." *Id.* at 564.

**B.    Discussion**

Defendant argues that months after the close of discovery—and only after Defendant said that it intended to file a MIL to limit Plaintiff's damages evidence—Plaintiff supplemented Dr. Leonard's expert report to include damages for 2019. *See* Dkt. No. 307. Defendant agrees "that it is common practice for a damages expert to provide an updated calculation of damages just before the time of trial, based on a previously (and properly) disclosed damages model." *See* Dkt. No. 339 at 1. However, Defendant argues that Dr. Leonard's Second Supplemental Report presents a new damages theory, not just updated calculations, and that the timing of the new theory was not substantially justified or harmless. The Court agrees.

As a threshold matter, the Court finds that Dr. Leonard's Second Supplemental Report altered his initial report and damages model. Throughout his initial report, Dr. Leonard expressly limited the "relevant time period" for a license that would result from a hypothetical negotiation to the period beginning in October 2016 through the end of 2018. *See* Leonard Initial Report at ¶¶ 43, 56, 68–69, 72–73, 112–13, 155. He also explicitly stated that he only "considered the relevant economic factors through 2018." *See id.* at ¶ 68. He acknowledged that such economic factors were likely to evolve moving forward into 2019, because Braftovi "was expected to compete as a third entrant the market" beginning in 2018, and would steadily gain market share. *See id.* at ¶ 72, & n.104. Dr. Leonard highlighted the uncertainty inherent in considering royalty rates after 2018:

> Potential competition from [Braftovi], and uncertainty regarding

---

[4] Whether to admit expert testimony is evaluated "under the law of the regional circuit," so in this case, under the law of the Ninth Circuit. *See Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1391 (Fed. Cir. 2003).

6

> approvals in additional patient populations *could influence the negotiated royalties for subsequent time periods*, but for the purposes of this report, I focus on the reasonable royalty for the time period from the date of first infringement up through 2018, or approximately the date of this report.

*Id.* (emphasis added).

During his deposition on May 1, 2019, Dr. Leonard confirmed that he did not present an opinion regarding damages for 2019. *See* Dkt. No. Dkt. No. 307-4, Ex. 3 ("Leonard Dep. Tr.") at 94:5. He said "if it comes to that, then I may do that at a later time, but I haven't as we sit here." *Id.* Defense counsel asked why he limited his report to the "relevant time period" of 2016 through 2018. Dkt. No. 307-4, Ex. 3 ("Leonard Dep. Tr.") at 93:10–25. Dr. Leonard highlighted that considering time periods after 2018 would present "a lot of additional complexities." *Id.* He explained:

> Q. You limit what you call the relevant time period for the hypothetical negotiation to the period from the issuance of the first patent through the end of 2018. Correct?
>
> A. Well, I'd say that's the part I'm determining what the royalty would be reached in the hypothetical negotiation. Because that's the only part that matters, only time period that matters for damages in this case, at least as we sit here. That's not to say the parties might have negotiated royalty for a subsequent period of time at the same time, but its' not really necessary for damages to know what that is, and there's, you know, a lot of additional complexities when you get beyond 2018, and there's no real reason to get into it. So that's why I'm referring to the period through 2018 as the relevant period.

*Id.* Dr. Leonard also acknowledged that there "shouldn't be any discount from an exclusive [royalty] rate to a non-exclusive rate for the period of the hypothetical negotiation" because of the limited therapies available at that time. *See id.* at 97:21–98:7. In short, Dr. Leonard developed a model for a reasonable royalty that only took into account the economic reality through the end of 2018.

Despite acknowledging in his initial report and during his deposition the complexities in calculating a royalty rate after 2018, Dr. Leonard asserted in his Second Supplemental Report that the royalty rate he calculated previously would still apply in 2019. This was a new opinion, and represented an expansion of Dr. Leonard's prior damages model and analysis. Yet Plaintiff did

7

not disclose this theory or Dr. Leonard's Second Supplemental Report until October 3, 2019.

Plaintiff asserts that Dr. Leonard's Second Supplemental Report merely recalculates damages based on new 2019 sales data from Defendant and thus is "a proper supplement" under Federal Rule of Civil Procedure 26(e). *See* Dkt. No. 333 at 9–15. Plaintiff points out that such updates are "both necessary and common where, as in this case, there is a substantial time gap between expert reports and trial." *Id.* Plaintiff's argument, however, fails to account for the explicit time constraints that Dr. Leonard placed on his royalty rate and damages calculation in his initial report. As explained above, Dr. Leonard cabined his analysis to the "relevant time period" of October 2016 through 2018. *See* Leonard Initial Report at ¶¶ 43, 56, 68–69, 72–73, 112–13, 155. Although it is true that Dr. Leonard relied on Tafinlar's new 2019 sales data in his Second Supplemental Report, that data merely supplied the royalty *base*. It did not implicate—or justify an opinion regarding—the royalty *rate* beyond 2018. Dr. Leonard even acknowledged this distinction in his Second Supplemental Report. *See* Dkt. No. 333-12, Ex. 11 at ¶ 4.

Of course, writing in 2018, Dr. Leonard was limited in how accurately he could forecast how the B-Raf inhibitor market would change over time. But he did not even attempt to consider a royalty rate that would apply outside of the 2016 to 2018 timeframe. To the contrary, he explicitly stated that he only "considered the relevant economic factors through 2018." *See id.* at ¶ 68. This acknowledgment is significant because in his initial report and deposition, Dr. Leonard explained that economic factors were likely to shift as Braftovi and other products entered the market and the parties sought to expand the patient populations for their drugs. *See, e.g.*, *id.* at ¶ 72, & n.104. Braftovi's market share was forecasted to increase, albeit modestly at first, over time. *Id.* And Defendant was seeking FDA approval of Tafinlar in the adjuvant line of care in 2019. *See id.* at ¶¶ 73–74. Rather than explain how his reasonable royalty rate would shift in light of these anticipated changes to the market after 2018, however, Dr. Leonard bypassed these complexities by focusing on the "relevant time period." He did not provide any model for damages after 2018. His Second Supplemental Report, therefore, did not simply update the damages calculation based on amended data, but expanded the application of Dr. Leonard's damages model to the circumstances existing in 2019. *See* Dkt. No. 333 at 11–12.

8

The Court thus rejects Plaintiff's reliance on Rule 26(e). As the Ninth Circuit has explained, "[R]ule 26(e) creates a "duty to supplement," but "not a right" to do so. *See Luke v. Family Care & Urgent Med. Clinics*, 323 Fed. App'x 496, 500 (9th Cir. 2009). The Ninth Circuit has cautioned that Rule 26(e) is not "a loophole through which a party who submits partial expert witness disclosures, or who wishes to revise [its] disclosures in light of [its] opponent's challenges to the analysis and conclusions therein, can add to them to [its] advantage after the court's deadline for doing so has passed." *Id.*; *see also Mariscal v. Graco, Inc.*, 52 F. Supp. 3d 973, 983–84 (N.D. Cal. 2014) ("Although Rule 26(e) obliges a party to supplement or correct its disclosures upon information later acquired, this does not give license to sandbag one's opponent with claims and issues which should have been included in the expert witness' report . . . ." (quotation omitted)). The supplementation requirement is only intended to "correct[] inaccuracies, or fill[] the interstices of an incomplete report based on information that was not available at the time of the initial disclosure." *Id.* (quotation omitted). The Court does not know why Dr. Leonard chose to limit his damages model so explicitly to the 2016 to 2018 timeframe. But having done so, he was not free to expand this damages model after the close of expert discovery and on the eve of trial.

The Court next considers whether the new report was substantially justified or harmless. When considering whether an untimely expert report is substantially harmless or justified, the Court may consider various factors, including: (1) prejudice or surprise to the party against whom the evidence is offered; (2) the ability of that party to cure the prejudice; (3) the likelihood of disruption of the trial; and (4) bad faith or willfulness involved in not timely disclosing the evidence. *See Lanard Toys Ltd. v. Novelty, Inc.*, 375 F. App'x 705, 713 (9th Cir. 2010).[5]

The prejudice from Dr. Leonard's expanded damages model is readily apparent. Expert discovery closed on May 2, 2019, the day after Dr. Leonard's deposition, and five months before Plaintiff served Dr. Leonard's Second Supplemental Report. *See* Dkt. No. 80. Moreover, at the time of Dr. Leonard's Second Supplemental Report, the pretrial conference and hearing on any

---

[5] Although not binding authority, the Court considers the Ninth Circuit's decision in *Lanard Toys* as persuasive authority.

9

motions in limine were set for two months later on December 3, 2019, and trial was set to proceed approximately three and a half months later, on January 21, 2020.[6] *See* Dkt. No. 276. Plaintiff left Defendant no time to depose Dr. Leonard about his new opinions or to provide a rebuttal report from Defendant's own damages expert. Although trial was later continued several more times due to COVID-19, this additional time did not liberate the parties to reopen discovery. Rather, the Court used this time to resolve the complex and voluminous disputes the parties had raised in motions for summary judgment, *Daubert* motions, and motions in limine, as well as disputes involving the jury instructions. Defendant would therefore be significantly restricted in its ability to effectively cross-examine Dr. Leonard at trial if the Court did not strike the Second Supplemental Report.

At the time of Dr. Leonard's initial report, Plaintiff also should have known that its damages expert—and his damages model—would need to account for damages through at least 2019, as trial in this case was initially set for the end of 2019. *See* Dkt. No. 80. Yet Dr. Leonard did not consider 2019 part of the "relevant time period" for damages. Therefore, in his initial report he did not expand the hypothetical negotiation's consideration beyond 2018, assess the possible impact of market forces after 2018, or estimate Tafinlar sales data for 2019 or any subsequent years.

The Court does not have reason to ascribe any bad faith to Plaintiff's delay in serving Dr. Leonard's Second Supplemental Report and his new damages model. Still, the Court finds it significant that Plaintiff did not request any 2019 sales data from Defendant until August 24, 2019—well after the close of expert discovery and four days *after* Defendant informed Plaintiff that it intended to file MIL No. 5 to preclude Plaintiff from presenting evidence at trial regarding damages after 2018. *See* Dkt. No. 333-3, Ex. 2. Perhaps Plaintiff only belatedly realized its oversight in failing to consider damages after 2018. But "[a] party that plays fast and loose with its damages theories risks having its whole theory struck, as well as additional sanctions." *Looksmart Grp., Inc. v. Microsoft Corp.*, 386 F. Supp. 3d 1222, 1232 (N.D. Cal. 2019) (citing Fed.

---

[6] At the time of Dr. Leonard's initial report, trial was set for October 7, 2019. *See* Dkt. No. 80.

1  R. Civ. P. 37(c)(1)).

2  The Court further notes that even if Plaintiff were somehow justified in waiting to serve Dr. Leonard's Second Supplemental Report and new damages model for 2019, it does not adequately explain the basis for Dr. Leonard's conclusion that the reasonable royalty rate that he calculated through 2018 (6.26% to 12.52%) should apply in 2019. He only touched on this issue in a single footnote, in which he asserted that the rates "remain reasonable royalty rates." *See* Dkt. No. 333-12, Ex. 11 at ¶ 4, n.2. Critically, Dr. Leonard did not explain why these rates remain reasonable when considering a license for 2019. This lack of explanation is particularly striking because Dr. Leonard recognized that the floor and ceiling he identified in his initial report for a royalty range would change for 2019. *See id.* He stated that the "bottom end of the bargaining range would decrease" and the "top end of the bargaining range would increase." *See id.* Plaintiff urges that Dr. Leonard's royalty rate was derived from the 2006 Roche Agreement, which did not change. *See* Dkt. No. 333 at 17. But Dr. Leonard did not simply adopt the royalty rates contained in that agreement. Rather, in his initial report he considered the similarities and differences between the 2006 Roche Agreement and the hypothetical negotiation, including differences in competition in the relevant markets. *See, e.g.*, Leonard Initial Report at ¶¶ 105–115. The likely market realities for 2019 are therefore relevant to, but unexplained in, Dr. Leonard's Second Supplemental Report.

The Court accordingly **GRANTS IN PART** and **DENIES IN PART** the motion. The Court **STRIKES** Dr. Leonard's Second Supplemental Expert Report. As discussed in more detail below, however, the Court does not preclude Plaintiff from presenting other evidence at trial about damages for any period after 2018.

### III. DEFENDANT'S MIL NO. 5

Defendant also moves to preclude Plaintiff from offering evidence relating to damages for any period before October 2016 or after December 2018. *See* Dkt. No. 272. Defendant contends that because Dr. Leonard limited his damages calculations to this timeframe, Plaintiff has waived the right to seek damages outside this timeframe. *Id.* Defendant's request appears to be twofold: *First*, it asks the Court to limit Dr. Leonard's opinions at trial to those expressed in his expert

11

report. *See id.* at 1–2. *Second*, it asks the Court to preclude Plaintiff from offering any other evidence or opinion regarding damages after 2018. *See id.* at 2–3.

To the extent that the parties' dispute turns on the scope of Dr. Leonard's expert reports, the Court has already found that in his initial report and First Supplemental Report he only offered opinions about a damages model through 2018. *See* Section II.B. The Court also rejected Plaintiff's effort to expand Dr. Leonard's model through his Second Supplemental Report. *Id.* Allowing Dr. Leonard to nevertheless testify about damages after 2018 would frustrate the purpose of Rule 26 and prejudice Defendant. Dr. Leonard, therefore, may not offer opinions at trial regarding the applicable royalty rate or amount of damages for any period after 2018. *See, e.g.*, *U.S. Fid. & Guar. Co. v. Lee Invs. LLC*, 641 F.3d 1126, 1138 (9th Cir. 2011) ("A district court does not abuse its discretion in limiting expert testimony to the expert's area of expertise and the subjects contained in the expert's disclosure.").

But Plaintiff has not waived its right to recover, or to proffer other evidence, of damages after 2018. Defendant points to the Patent Local Rules, which require parties asserting infringement to provide a fulsome statement of their damages contentions. *See* Patent L.R. 3-8. But Plaintiff's damages contentions specify that it seeks damages no less than a reasonable royalty. *See* Dkt. No. 327-2, Ex. 1 at 1 (citing 35 U.S.C. § 284). Under § 284, if Plaintiff prevails at trial, it would be entitled to receive "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." *See* 35 U.S.C. § 284. The Federal Circuit has emphasized that § 284 is "unequivocal" in granting the right to damages for infringement. *See Dow Chem. Co. v. Mee Indus., Inc.*, 341 F.3d 1370, 1381 (Fed. Cir. 2003). In fact, the Federal Circuit has cautioned that even if Plaintiff's "evidence fails to support its specific royalty estimate, the fact finder is still required to determine what royalty is supported by the record." *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1327 (Fed. Cir. 2014), *overruled on other grounds by Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015). "[A] fact finder may award no damages only when the record supports a zero royalty award." *Id.* at 1328.

The lack of expert testimony is thus not dispositive. Although § 284 provides that "[t]he

12

court may receive expert testimony as an aid to the determination of damages or what royalty would be reasonable under the circumstances," the Federal Circuit has clarified that "expert testimony is not necessary to the award of damages." *Dow Chemical*, 341 F.3d at 1381–82 (vacating district court's denial of damages after court excluded patentee's expert report). At this stage, the Court declines to predict what other evidence Plaintiff might try to present to support its request for a reasonable royalty rate. But it is clear that Plaintiff is not restricted to Dr. Leonard's expert testimony alone. The Court therefore **GRANTS IN PART** and **DENIES IN PART** Defendant's MIL No. 5.

## IV. CONCLUSION

Accordingly, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant's motion to strike and **GRANTS IN PART** and **DENIES IN PART** Defendant's MIL No. 5. At trial, Plaintiff may not rely on or proffer evidence regarding Dr. Leonard's Second Supplemental Report. The Court further limits Dr. Leonard's testimony to the scope of his initial report and First Supplemental Report. Therefore, Plaintiff may not rely on Dr. Leonard to offer testimony at trial regarding a reasonable royalty rate applicable after 2018.

Due to recent developments in the Court's COVID-19 protocols, the Court further **SETS** a telephonic case management conference on June 25, 2021, at 1:00 p.m., to discuss logistics for the upcoming trial.

Counsel and all others who wish to listen to the proceedings may do so by calling in, using the following credentials:

**Dial-In:** 888-808-6929

**Passcode:** 6064255

Persons granted remote access to court proceedings are reminded of the general prohibition against photographing, recording, and rebroadcasting of court proceedings (including those held by telephone or videoconference). *See* General Order 58 at Paragraph III. Any recording of a court proceeding held by video or teleconference, including "screen-shots" or other visual copying of a hearing, is absolutely prohibited. Violation of these prohibitions may result in sanctions, including removal of court-issued media credentials, restricted entry to future hearings, or any

13

other sanctions deemed necessary by the court.

**IT IS SO ORDERED.**

Dated: 6/23/2021

_____
HAYWOOD S. GILLIAM, JR.
United States District Judge